IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KEVIN McCORMICK, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 23 C 1998 |
| CHICAGO TRANSIT AUTHORITY, | ) ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Kevin McCormick sued his former employer, the Chicago Transit Authority (CTA), for terminating him after he declined to comply with the CTA's COVID-19 vaccination policy. McCormick alleged that the CTA discriminated against him based on his religion, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a). Following a four-day trial, a jury returned a verdict in McCormick's favor. The CTA has moved for judgment as a matter of law and, alternatively, for a new trial. For the reasons below, the Court denies the CTA's request for judgment as a matter of law but orders a new trial.

## Background

### A. Procedural history

On March 29, 2023, McCormick filed a complaint alleging that the CTA discriminated against him based on his religion in connection with his request for a religious exemption from the CTA's COVID-19 vaccination mandate. . McCormick asserted three claims. In count 1 of his complaint, McCormick claimed that the CTA

failed to reasonably accommodate his religious beliefs in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a).  In count 2, he claimed, under 42 U.S.C. § 1983, that the CTA discriminated against him in violation of the Equal Protection Clause of the Fourteenth Amendment.  In count 3, McCormick claimed that the CTA substantially burdened his religious exercise in violation of the Illinois Religious Freedom Restoration Act, 775 ILCS 35/15.  On August 30, 2023, the Court granted the CTA's motion to dismiss count 2.  On May 19, 2025, the Court granted the CTA's motion for summary judgment on count 3.  The parties proceeded to trial on count 1.

Each side disclosed a witness to render opinion testimony at trial, and each side moved to exclude the other side's expert witness.  The Court granted the CTA's motion to exclude McCormick's expert.  On McCormick's motion, the Court found the majority of the testimony proffered by the CTA's expert admissible but excluded certain aspects of the expert's testimony.  At the final pretrial conference, however, the CTA informed the Court that it was not pursuing an undue hardship defense.  Based on this, the Court limited the testimony of the CTA's expert to preclude any testimony related to the prevalence and spread of COVID-19 and how the CTA's policy was consistent with CDC and OSHA guidance.  The Court determined that admission of this testimony would be unfairly prejudicial, confusing, and/or a waste of time given its minimal probative value in view of the fact that the CTA was not pursuing an undue hardship defense.

**B.     Trial testimony**

McCormick testified that he was baptized, received his first communion, and was confirmed at St. Bede the Venerable Catholic Church.  Tr. 111:17–18, 112:2–5, 178:12–

2

16. He also attended Catholic school for fourteen years. *Id.* at 112:10–18, 113:11–18. McCormick and his family remain active in the Catholic Church. *Id.* at 59–62, 124–25.

During the COVID-19 pandemic, the CTA established a policy requiring its employees to obtain the COVID-19 vaccine. Joint Ex. 4. CTA employees could seek an exemption from the vaccination policy based on their religious or moral convention objections. *Id.* at 474:1–4. The CTA informed employees that, under the policy, they must either become vaccinated or obtain an exemption. *Id.* at 464:16–23. The policy also stated that an employee could be discharged for noncompliance. *Id.* at 464:23–25.

The CTA created a religious accommodation committee to review requests for religious-based exemptions. *Id.* at 468:17-25. Theresa Fletcher Brown, CTA's director of equal employment opportunity and compliance programs and its designated EEO officer, was a member of the religious accommodation committee. *Id.* at 450:12–13, 467:24–25, 468:1–4. The committee also included members of Fletcher Brown's team and one representative from human resources. *Id.* at 468:1-4. Three members of the committee were voting members, meaning those members voted on whether to grant an employee a religious exemption. *Id.* at 469:16-17.

McCormick sought a religious-based exemption from the CTA's vaccine requirement. Joint Ex. 11; Tr. 179:18–20. McCormick's religious accommodation request stated, in part:

> As a practicing Catholic, I cannot in good conscience accept an experimental mRNA gene therapy drug that includes the use of aborted fetal cell lines. These heinous acts contradict my religious beliefs. I also believe my body was created in the image of Christ and to alter it in such ways would be to reject the Lord, Jesus Christ.

Joint Ex. 11. McCormick's request also stated "[a]s a Catholic, I support life. This

3

position is not limited to opposing abortion; it extends to opposing both COVID vaccines tested using aborted fetal cell lines[.]" *Id.* The religious accommodation committee sent McCormick follow-up questions and informed him he had seven days to respond. Tr. 506:5–8. McCormick responded to these questions with additional information. *Id.* at 506:23-25; Joint Ex. 13.

Fletcher Brown testified that McCormick's accommodation request indicated that he had Catholic beliefs. Tr. 504:10. Fletcher Brown also testified that she thought McCormick had a sincerely held religious belief and did not doubt the sincerity of his religious belief. *Id.* at 558:10–14. Fletcher Brown testified that the religious accommodation committee instead questioned the "completeness of [McCormick's exemption request] package and how it wavered from one position to another." *Id.* at 504:11–13.

The CTA denied McCormick's religious accommodation because it did "not substantiate a sincerely held religious belief or moral conviction that conflicts with CTA's requirement that all employees be fully vaccinated against Covid-19." Pl.'s Ex. 18; Tr. 508:9–14. Fletcher Brown testified that the religious accommodation committee denied McCormick's request because it was "very confusing" "to understand where the conflict was because of the preponderance of the information that was so unrelated to Title VII." Tr. 510:9–12. Fletcher Brown also testified that McCormick's sincerely held religious belief was not a factor in the religious accommodation committee's denial of his accommodation request. *Id.* at 559:2–5.

Fletcher Brown informed McCormick and Jeanine Messina, McCormick's business manager, that McCormick's religious accommodation request was denied. *Id.*

4

at 650:1-9; Joint Ex. 14.  This communication informed McCormick that he would need to comply with the vaccination mandate or his employment would be terminated.  *Id.*  Following this denial, McCormick did not obtain a COVID-19 vaccine.  Tr. 364:8-20.  On April 22, 2022, following a series of meetings to discuss McCormick's compliance (or lack thereof) with the vaccine mandate, Messina recommended termination of McCormick's employment.  Joint Ex. 19.  Messina sent the recommendation to terminate McCormick's employment to William Mooney, the CTA's Chief Infrastructure Officer.  *Id.*  Mooney ultimately discharged McCormick on April 25, 2022 for violation of the CTA's COVID-19 vaccine policy.  Joint Ex. 15; Tr. 227: 1–4.

After a four-day trial, the jury returned a verdict in McCormick's favor.  On September 23, 2025, the Court entered judgment reflecting the jury's verdict, with a reduced damages award pursuant to Title VII's damages cap.

## Discussion

### A. Motion for judgment as a matter of law

Under Federal Rule of Civil Procedure 50(b), judgment as a matter of law is proper if "a reasonable jury would not have a legally sufficient evidentiary basis" to support a verdict for the nonmovant.  Fed. R. Civ. P. 50(a)(1), (b); *see Thorne v. Member Select Ins. Co.*, 882 F.3d 642, 644 (7th Cir. 2018).  On a Rule 50(b) motion, a court "construes the evidence strictly in favor of the party who prevailed before the jury and examines the evidence only to determine whether the jury's verdict could reasonably be based on that evidence." *Passananti v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2012).  Courts are "obligated to review the record to ensure that sufficient evidence exists to support the verdict, but [courts] will not otherwise consider the weight

of the evidence" or "reevaluate the credibility of witnesses." *McNabola v. Chi. Transit Auth.*, 10 F.3d 501, 515 (7th Cir. 1993). Consequently, a jury verdict will be overturned only if a court concludes that "no rational jury could have found for the prevailing party." *Stragapede v. City of Evanston*, 865 F.3d 861, 865 (7th Cir. 2017) (internal quotation marks omitted).

The jury was instructed that, to succeed on his claim, McCormick had to prove three elements by a preponderance of the evidence:

> 1. Mr. McCormick had an observance or practice that was religious in nature that conflicted with an employment requirement. This requires McCormick to prove by a preponderance of the evidence that the belief for which he sought protection was religious in his own scheme of things, and that the religious belief was sincerely held. Mr. McCormick is not required to show that the belief or observance is tied to an organized group or a widely recognized faith or religion.
>
> 2. Mr. McCormick notified the CTA of the religious observance or practice.
>
> 3. Mr. McCormick's religious observance or practice was a motivating factor for his termination.

Final Jury Instr. at 9.

The CTA challenges sufficiency of the evidence only on the third element: that no rational jury could have returned a verdict for McCormick because there was no evidence that his religion was a motivating factor in the CTA's decision to terminate his employment. McCormick responds that the CTA denied his religious accommodation request "on the alleged basis that [McCormick's] accommodation request failed to 'substantiate a sincerely held religious belief or moral conviction that conflicts with CTA's requirement that all employees be fully vaccinated against Covid-19.'" Pl.'s Resp. at 11 (quoting Pl.'s Ex. 18). McCormick goes on to argue that the CTA then

terminated him for his noncompliance with the vaccination policy, noncompliance that was caused by the CTA's inappropriate denial of his religious accommodation request.

The CTA does not dispute that a reasonable jury could have found that McCormick had an observance or practice that was religious in nature (refusal of the COVID-19 vaccine based on his Catholic beliefs) that conflicted with the CTA's vaccination policy. Instead, the CTA argues that the "CTA's decision makers did not have any knowledge of [McCormick's] Catholic beliefs, which of course demonstrates that they were not influenced by [his] religion when making their determinations." Def.'s Mot. at 7. This argument is unpersuasive as a basis for overturning the jury's verdict.

Terminating an employee for an action that was based on the employee's sincerely held religious beliefs makes the employee's religion the "basis" for that firing, whether or not legitimate business reasons supported the employer's denial of an accommodation. *See Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 454 (7th Cir. 2013) (concluding that an employee's religious beliefs were the basis for his firing despite the employer's argument that it was his "absence," as the employee "was absent to observe his religious practices, and he was fired as a result of that absence"); *Boyd v. Chi. Transit Auth.*, No. 24 C 2727, 2025 WL 2765107 (N.D. Ill. Sept. 28, 2025) (Kennelly, J.). It is undisputed that the CTA terminated McCormick because he was not in compliance with its COVID-19 vaccination policy; the CTA never advanced any other reason for his termination. And, at this point, the CTA does not dispute that the evidence was sufficient to permit a reasonable jury to find that McCormick's noncompliance was based on his religious beliefs.

The CTA cites testimony from two CTA witnesses who were involved in the

termination of McCormick's employment "after his religious exemption request was denied and he refused to get vaccinated." Def.'s Mot. at 4. These witnesses testified that they were not familiar with McCormick's religious observances or beliefs. Tr. 660:19–21, 704:4–8. These "decision makers" recommended McCormick for termination, and ultimately terminated his employment, because he was in noncompliance with the vaccine mandate. And McCormick's noncompliance was caused, at least in part, by the religious accommodation committee's denial of his religious accommodation request. Thus a reasonable jury could find that McCormick's refusal of the COVID-19 vaccine was a religious action and that this action was a motivating factor in or the but-for cause of the CTA's decision to terminate his employment.

      The CTA also argues that McCormick's only evidence at trial on this element was his acknowledgement that he had no reason to believe that any member of the religious accommodation committee had any bias towards him. This argument lacks merit. A Title VII plaintiff's lack of knowledge regarding the reason for his termination has minimal probative value at best; the question is the employer's reason for acting, not the employee's knowledge. To put it another way, what an employee believes or doesn't believe about the employer's reason for acting is barely even relevant and certainly has little probative value. As discussed, a reasonable jury could have determined that the CTA terminated McCormick based on his refusal of the COVID-19 vaccine and that his refusal was based on his religious beliefs.

      Finally, the CTA argues that Fletcher Brown testified that she did not discriminate against McCormick based on his religion when she reviewed and voted on his

application for a religious exemption. But the Court cannot, on a motion for judgment as a matter of law, reweigh the evidence or conclude that Fletcher Brown's testimony carries the day against the evidence cited by McCormick.

In short, a reasonable jury could conclude that McCormick proved, by a preponderance of the evidence, that he had an observance or action that was religious in nature (refusal of the COVID-19 vaccine) and that this observance or action was a motivating factor in or the but-for cause of his termination.

**B.     Motion for a new trial**

The CTA has alternatively moved under Federal Rule of Civil Procedure 59(a) for a new trial based on four arguments: (1) the jury's verdict was against the manifest weight of the evidence, (2) the CTA was prejudiced by plaintiff's counsel's conduct throughout the trial, (3) the Court erred in providing a mixed motive instruction, and (4) the Court erred in excluding portions of the testimony of the CTA's expert. The Court will address each of these arguments in turn.

**1.     Manifest weight of the evidence**

A new trial is warranted under Rule 59(a) if the verdict was "against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Martinez v. City of Chicago*, 900 F.3d 838, 844 (7th Cir. 2018). In making this determination, a court "has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Whitehead v. Bond*, 680 F.3d 919, 928 (7th Cir. 2012). The Seventh Circuit has cautioned that a court should grant a new trial "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the

9

verdict, on the record, cries out to be overturned or shocks our conscience." *Estate of Burford v. Accounting Practice Sales, Inc.*, 851 F.3d 641, 646 (7th Cir. 2017).

As discussed, in its motion the CTA does not dispute that a reasonable jury could conclude that McCormick had a religious observance or practice: refusal of the COVID-19 vaccine. And McCormick presented evidence that the CTA acted based on his noncompliance with the vaccination policy—noncompliance that was premised on his religious beliefs (at least a reasonable jury could so find). Based on this evidence, the jury's determination was not contrary to the manifest weight of the evidence.

### 2. Misconduct by plaintiff's counsel

A court may grant a motion for a new trial under Rule 59(a) based on misconduct by the opposing party or counsel, but to obtain this "dramatic relief," the movant must demonstrate that the misconduct prejudiced it. *Brandt v. Vulcan, Inc.*, 30 F.3d 752, 758 (7th Cir. 1994).

The CTA argues that a new trial is required because McCormick's counsel Frank Avila "engaged in a variety of improper tactics and antics that, taken as a whole, plainly and unfairly prejudiced CTA's defense." Def.'s Mot. at 9. The CTA identifies fourteen instances of misconduct that it broadly buckets into four categories: (1) improper comments during closing argument, (2) improper questions about how the CTA treated other employees even though this testimony was precluded by an *in limine* ruling, (3) potential witness tampering based on the plaintiff's discussions with counsel during a break while he was testifying, and (4) a reference by counsel to a priest sitting in the gallery. The CTA notes—and the Court agrees—that these are only examples of plaintiff's counsel's misconduct. There are several additional instances of similar

10

conduct in the record. As the Court stated multiple times during the trial, plaintiff's counsel's conduct in these respects was improper.

Take one particularly egregious example. Counsel repeatedly asked a CTA witness about the CTA's treatment of other employees even though the Court had barred this evidence after an extended discussion during the pretrial conference. At trial, the Court told counsel that these questions were improper and that continued questions on the topic could result in a mistrial. Tr. 639:16–25, 640:1–3. Despite this, moments later, counsel again asked if McCormick was "treated differently than anyone else." *Id.* at 640:25, 641:1–3. During his closing argument, counsel also repeatedly stated purported facts that were not in evidence, asked the jury to put themselves in McCormick's shoes (a "golden rule"-type argument), and disparaged the CTA's counsel with personal attacks.

Though Avila's actions in this regard were improper, each time the CTA objected, the Court sustained the objection and several times directed the jury to disregard the inappropriate references. On the issue of discussion between McCormick and his counsel during a break in his testimony, the Court concluded at the time that it would remove the sentence from the jury instructions that would typically inform the jury that it was proper for counsel to communicate with any witness in preparation for trial, and it gave the CTA permission to question McCormick about the issue. And the inappropriate comments during closing argument were, in the overall scheme of things, a relatively small part of an otherwise unobjectionable argument. For these reasons, the Court concludes this misconduct does not meet the high bar required to order a new trial. *Venson v. Altamirano*, 749 F.3d 641, 657 (7th Cir. 2014). Still, the Court notes

11

again that Avila's behavior was improper. At the retrial ordered below, the Court intends to keep Avila on a much shorter leash.

### 3. Jury instruction

"To win a new trial based on an incorrect jury instruction, [a party] must show both that (1) the instruction inadequately states Seventh Circuit law; and (2) the error likely confused or misled the jury causing prejudice to the [moving party]." *O'Donnell v. Caine Weiner Co., LLC*, 935 F.3d 549, 552 (7th Cir. 2019).

The CTA argues that "[t]he Court committed manifest error by instructing the jury that CTA could be liable if [McCormick] proved that his religious observance or practice was *a motivating factor* for his termination." Def.'s Mot. at 20 (emphasis added). The CTA contends that this instruction misstates the law because this is a single motive case and thus McCormick was required to establish "but for" causation. For this reason, the CTA argues, the Court erred in giving the jury a mixed motive instruction based on *Kluge v. Brownsburg Community School Corp.*, 150 F.4th 792 (7th Cir. 2025), and *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 773 (2015).

The CTA is right that *Kluge* and *Abercrombie* were mixed motive cases. But that does not necessarily mean that the standard for proving causation changes based on whether the case is a single motive or mixed motive case. *See Rapold v. Baxter Int'l Inc.*, 718 F.3d 602, 610 (7th Cir. 2013) (stating that some circuits provide a mixed motive instruction in all Title VII cases, but the Seventh Circuit has "never explicitly adopted one approach over the other . . . "); *see also Akrabawi v. Carnes Co.*, 152 F.3d 688, 694 (7th Cir.1998) ("[b]ecause the statute contains ['motivating factor'] language, district courts might be better advised to ask juries to determine whether discrimination

was a motivating factor in a defendant's employment decision. Of course, such an approach would probably require an accompanying instruction defining 'motivating factor.'"). The statute does not say, and the Seventh Circuit has not determined, that such a distinction exists. Ultimately, however, the deficiency in the instruction the Court gave in this case does not require the Court to answer this question at this point.

Under the law, "[i]f an employee in a mixed-motive case establishes that [his protected characteristic] was a motivating factor for the employment action, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision regardless of the plaintiff's [protected characteristic]." *Rapold*, 718 F.3d at 609. "This partial defense bars the plaintiff from recovering damages but allows for declaratory and injunctive relief as well as limited attorney's fees and costs." *Id.*

Based on this case law, the Seventh Circuit pattern instructions recommend that a mixed motive instruction include the following language:

> A motivating factor is something that contributed to Defendant's decision. *If you find that Plaintiff has proved that his [protected class] contributed to Defendant's decision to [adverse employment action] him, you must then decide whether Defendant proved by a preponderance of the evidence that it would have [adverse employment action] him even if Plaintiff was not [protected class]*. If so, you must enter a verdict for the Plaintiff but you may not award him damages.

Seventh Circuit Pattern Civil Jury Instructions § 3.01, cmt. c (2017) (emphasis added). The jury instruction that the Court gave did not include this language, and in particular did not include the burden-shifting part of the instruction. The Court erred; the instruction it gave did not adequately state Seventh Circuit law.

The CTA has persuasively argued that if the Court had included this

13

additional language, it might have been able to pursue different defense strategies. For example, the CTA says that it "would have adduced evidence that even if [McCormick's] religion [was] a factor in CTA's termination decision, it would have made the decision to deny his accommodation anyway." Def.'s Mot. at 25. And the jury could have found the CTA liable but not awarded damages. The CTA was prejudiced by the instruction; a new trial is required.

### 4. The CTA's expert

Finally, the CTA argues that the Court improperly limited its expert's testimony about "the prevalence and spread of COVID-19 and how CTA's policy was consistent with CDC and OSHA guidance." Def.'s Mot. at 27. The CTA argues that Dr. Mark Roberts' testimony "was central to CTA's defense in this case, i.e., that it terminated [McCormick's employment] because [of] his failure to comply with the CTA's vaccination policy, which was implemented to protect the health and safety of its employees and the public at large." Def.'s Mot. at 26.

After considering McCormick's motion *in limine* to preclude Dr. Roberts' testimony, the Court denied it in significant part, ruling as follows:

> [T]he remainder of Dr. Roberts's opinions that are challenged by McCormick are admissible at trial, with some limits. First, his testimony about the prevalence and community spread of COVID-19 during the relevant time period and the consistency of the CTA's vaccination mandate with CDC and OSHA guidance is relevant and admissible on the question of undue hardship. Second, the same is true regarding the safety risk posed by McCormick's noncompliance with the vaccination mandate. McCormick contends that this testimony is irrelevant because it was not cited by the CTA at the time. But he offers no authority for the proposition that this makes the evidence inadmissible on the undue hardship question. More generally, the CTA is entitled to explain (within the limits regarding cumulativeness, etc. posed by Federal Rule of Evidence 403) its basis for establishing and following the policy that was applied to McCormick and that led to his

14

> termination. This is so even if, as McCormick contends, he is not challenging the policy generally, but only its application.
>
> The Court also declines to exclude Dr. Roberts's testimony regarding how and to what extent fetal cell lines were used in the development and testing of the vaccine.

Dkt. 165 at 9-10.

At the final pretrial conference, however, the CTA advised that it had decided not to pursue an undue hardship defense. Aug. 21, 2025 Tr. 5:16–19, 12:14–17. It nonetheless argued that Dr. Roberts' testimony was admissible "to have the expert corroborate the important purposes that the policy functioned to achieve in light of what was going on with the pandemic at the time." *Id.* at 60:2–5. The CTA contended that this testimony was relevant and not unduly prejudicial because it supported the CTA's defense that "acting consistently with those goals, that was the reason for [McCormick's] termination," "not [ ] religious discrimination." *Id.* at 60:6–12. The Court excluded the testimony for this purpose, stating:

> [N]ow that I have a better picture of how this case is actually going to be tried and the undue hardship defense isn't going to be argued, essentially what the purpose of the expert is on this aspect of his testimony . . . is essentially to corroborate what the decision maker is going to say about why he denied [McCormick's exemption request]. We had this policy. It was an important policy. Here's why we thought it was important. He wasn't complying with the policy and we terminated him. I think . . . the fact that the undue hardship isn't going to be in there nudges this part of the expert's testimony over the Rule 403 line.

*Id.* at 61:22-62:9. Essentially the Court determined that the testimony amounted to inappropriate bolstering of testimony by the CTA's decisionmaker(s) about their state of mind when acting and was unnecessarily cumulative for that reason, in a way that outweighed the testimony's probative value.

15

As discussed above, there is a reasonable possibility that if the Court had instructed the jury correctly, the CTA would have modified its defense strategy. The Court will therefore address the admissibility of Dr. Roberts' testimony at a pretrial hearing in advance of the new trial.

## Conclusion

For the foregoing reasons, the Court grants in part and denies in part the CTA's motion for judgment as a matter of law and for a new trial [dkt. no. 194]. The Court sets the case for trial on February 2, 2026 at 9:15 a.m. and also sets the case for an in-person status hearing on January 6, 2026 at 9:30 a.m. Lead counsel for both sides are directed to appear on that date.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: December 22, 2025